Hiram M. REED, Laura M. Reed, a widow, and Hiram M. Reed, as Executor and Testamentary Trustee of the Estate of D. C. Reed, deceased, Appellants,

v.

RIDDLE AIRLINES et al., Appellees.

No. 17261.

United States Court of Appeals Fifth Circuit.

April 23, 1959.

Rehearing Denied May 28, 1959.

Thomas H. Anderson, Miami, Fla., Coleman Gay, Austin, Tex., Anderson & Nadeau, Miami, Fla., for appellants.

Frank A. Howard, Jr., James A. Dixon, Fred R. Baisden, Dixon, DeJarnette, Bradford & Williams, Miami, Fla., for appellee John Paul Riddle.

Before RIVES and TUTTLE, Circuit Judges, and SIMPSON, District Judge.

RIVES, Circuit Judge.

The appellants Reed sued for rescission of a contract by which they had

agreed to sell 112,500 shares of stock in Riddle Airlines, Inc., to appellee, John Paul Riddle. Riddle counterclaimed for specific performance, or in the alternative for damages. The case was heard before the court aided by an advisory jury. The court denied to the appellants the rescission of their contract and awarded the appellee Riddle a judgment against the appellants for $96,475.15.

The contract was agreed on between John Paul Riddle and Hiram Reed and called for the sale of the stock to Riddle for an average price of sixty cents per share payable over a period of four months. Riddle was president and general manager of Riddle Airlines and conversant with its affairs. Reed was a minority stockholder living in Austin, Texas, a considerable distance from the corporation's principal office in Miami, Florida. The basis of Reed's claimed right of rescission is thus summarized in appellants' brief:

"Reed claimed that Riddle occupied a fiduciary capacity as president and general manager of the corporation and that he owed a duty to disclose the facts which he knew affecting the value of the stock; that Riddle failed to disclose the fact that Arthur Vining Davis had become interested in buying stock in the corporation; that Riddle misrepresented the facts when he told Reed that there was no market for

the stock; and that plaintiffs were entitled to rescind both because of the failure of the fiduciary to disclose a material fact and because of the representation that there was no market for the stock when in fact Davis was ready, able, and willing to buy large amounts of stock."

The appellants insist that, as president and general manager of the corporation, Riddle owed a fiduciary duty to the stockholders to disclose knowledge affecting the value of the stock which had come to his knowledge as an "insider," before purchasing the same from a shareholder. We agree, and have recently held to that effect in Mansfield Hardwood Lumber Company v. Johnson, 5 Cir., 263 F.2d 748, affirming a well-considered decision of Judge Ben C. Dawkins, Jr., of the Western District of Louisiana, reported in D.C., 159 F. Supp. 104, et seq. In this case that duty is emphasized by the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a, et seq., and by Rule X–10B–5 adopted by the Securities and Exchange Commission to supplement Section 10(b) of that Act.[1] See Speed v. Transamerica Corporation, D.C.Del.1951, 99 F.Supp. 808, 828, 829. While we thus agree with the legal basis of appellants' claimed right of rescission, we do not agree that the evidence established such a right under the applicable law.

---

1. Section 10(b) of the Act provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
\* \* \* \* \*
"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j.

Rule X–10B–5 of the Commission provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.
"(1) to employ any device, scheme, or artifice to defraud,
"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."

Riddle Airlines, Inc., was engaged in the transportation of freight by air. It was organized shortly after the Second World War by John Paul Riddle who was its president until May, 1953. At about that time, the appellants Reed concurrently with five other persons, all of whom came to be known as "the Texas group" of stockholders, purchased as a whole about 300,000 shares of stock at forty cents per share. Riddle was replaced as president. Reed was made a director and later Judge C. R. Starnes of Gladewater, Texas, another member of the Texas group, became a director. Judge Starnes was a long-time friend and business associate of Reed. In August 1954, Riddle and his supporters regained control of Riddle Airlines, Inc., and Riddle again became president. Reed resigned as a director, but Judge Starnes remained a director until March 1955, when he also resigned. The contract involved in this suit was made on March 28, 1955.

Mr. Arthur Vining Davis had then become interested in buying stock in Riddle Airlines, Inc. Mr. Davis was an elderly man of great wealth and Chairman of the Board of Directors of Aluminum Corporation of America (Alcoa). Prior to March 24, 1955, Riddle had met Davis once at a heart benefit held at Davis' home and attended by several hundred people, but there had been no business dealings between Riddle and Davis.

On Thursday, March 24, 1955, Riddle contacted Mr. Davis by telephone and made an appointment to meet with him at Davis' office the following morning. Mr. Davis had acquired control of several enterprises and immediately thereafter they had ceased to ship air cargo on Riddle Airlines. Riddle's purpose in contacting Mr. Davis was to discover the reason for this loss of business and to endeavor to recapture it. The interview was concerned with that subject, the aluminum business, and aviation in general. Mr. Davis testified that a week or two before that meeting he had considered in his own mind the matter of buying Riddle Airlines stock, but that, as far as he knew, Riddle knew nothing about that. Riddle frankly admitted, however, that he sensed Davis' interest at this first meeting. "I knew he was interested—I could tell." That first meeting was on Friday, March 25.

On Sunday, the 27th, Riddle telephoned to Judge Starnes in Gladewater, Texas. Before the trial, Judge Starnes died. The district court sustained the plaintiffs' objections to Riddle's testimony as to their phone conversation. On cross-examination, however, plaintiffs' counsel announced, "I have nothing to hide," and himself inquired as to the conversation, with the results quoted in the margin.[2] That Riddle told Judge

2. "Q. Now on Sunday you talked with Judge Starnes? A. Right.

"Q. What did you tell him? A. I told him that I had his resignation from the Board. Judge Starnes said yes, he wanted to resign and wanted to sell his stock. The Texas group were trying to sell the stock. If I didn't buy it or get someone to buy it they would sell it to someone else in New York. So I said, 'What do you want for it?' He said the best figure they ought to get, fifty-five cents. I said, 'That is pretty high, Judge, at this time.' I said, 'Can I have time?' 'No,' he was leaving the next day on three months' vacation, and that he would have to do something right then. I said, 'Judge, we would rather prefer to see you people stay in the company. I have always told you that.' He said,

'We are not going to stay in. We are too far out here and we want to get rid of our stock.' I will give you a call back tomorrow. Are you speaking for the whole Texas group?'

"Q. Is that you or he saying that? A. He said it. He was speaking for the whole Texas group. So he said, 'If you can sell my stock or take my stock at fifty-five cents it is a deal.' I asked him how much he had. He said sixty-six thousand or sixty-eight thousand five hundred shares; and I called Mr. Davis the next morning and asked Mr. Davis if he would be interested in taking stock from a gentleman in Texas at fifty-five cents a share. We talked for a few minutes and he finally said, 'Well, I don't know.'

Starnes that Arthur Vining Davis was buying his stock is not contradicted, but is conclusively proved by the written draft drawn for the purchase price of the stock over the signature of "C. R. Starnes," dated March 28, 1955, in the amount of $35,000 and drawn on "Arthur Vining Davis" by his full name.

Later in the same day, Monday, March 28, Riddle telephoned Reed in Austin, Texas, and was informed by Reed that Judge Starnes had already communicated with him. In that telephone conversation the contract involved in this suit was agreed on.

Most of the special findings of the advisory jury related to the critical telephone conversation between Riddle and Reed. Those findings were as follows:

"1. Did John Paul Riddle in his first telephone conversation with Mr. Reed on March 28, 1955, tell Mr. Reed that there was no market for the Riddle Airlines Stock.

"Yes ......

"No .. No ...

"Q. He said he didn't know? A. He said, 'I don't know.' I talked a little bit longer with him and he said, 'Well, have him send it to me and I will send him a check.' I said, 'All right.' So I got to thinking about it. He said he was going to leave on a vacation. I got hold of Mr. Davis and I said, 'If you are going to buy that stock the better way would be to have a sight draft sent.' He said, 'Well, all right, have it sent to me at the Florida National Bank, sight draft attached.' I called Judge Starnes and told him that, that it was Mr. Arthur Vining Davis who was buying the stock. I didn't know whether he would buy any more or not. And Judge Starnes, when I called him back—I said, 'This is Mr. Davis buying the stock. Send the sight draft straight to him at the Florida National Bank. What about the rest of the Texas group? What are they going to do? He said, 'They want to sell their stock. I haven't handled them, but I am leaving and going on a three months' vacation. Call Hiram Reed. They were willing to sell it cheaper, but now think they should get fifty-five cents, and they paid forty cents, and it will take them out for the time they have been in it.' He said, 'I will call and tell him what

"2. Did John Paul Riddle know, or have good reason to believe that at the time of that telephone conversation that Mr. Arthur Vining Davis was going to become a purchaser of substantial amounts of stock, other than the stock of Judge Starnes.

"Yes ... Yes ..

"No .....

"3. If your answer to the above question is 'yes,' was Mr. Reed in that telephone conversation induced to make the agreement for the sale of the stock of the Reed Estate and his mother by reason of and by misrepresentation or nondisclosure on the part of Mr. Riddle.

"Yes ......

"No ... No ...

"4. What was the market value of the Riddle Airlines Stock on July 28, 1955, the date the defendant in the case, John Paul Riddle, tendered the remaining balance to Miami Beach First National Bank.

I have done and all about it and give him the details.'

"Q. Is that the end of the conversation with Judge Starnes? A. We talked some more. I said, 'Judge, I would like to have you stay in.' He said, 'Well, for sentiment, I will send sixty thousand. I have more than that but I will keep the balance. I will stick with you that way.' I said, 'That's fine.' I believe he had sixty-six thousand or sixty-eight thousand shares. I am not sure.

"Q. Well, now, do I understand your testimony to be that when you first had your conversation with Judge Starnes on Sunday, the 27th of March, you had no understanding of any sort with Mr. Davis to the effect that he was interested in buying a single share of Riddle Airlines stock. Is that correct? A. That is correct. Judge Starnes was the first stock I got him interested in buying.

"Q. And there was no understanding of any sort on the part of Mr. Davis to buy a single share until the 28th of March, 1955? A. That is correct.

"Q. And that was the shares of Judge Starnes; is that correct? A. That is correct. Judge Starnes' stock was the first."

"$1.50 Dollars"

The findings of fact of the district court as to the alleged misrepresentation and the claimed failure to disclose Arthur Vining Davis' interest were as follows:

"14. There was * * * a conflict of the testimony given by Mr. Reed and Mr. Riddle as to whether or not Mr. Riddle in this conversation told Mr. Reed that there was no market for his stockholdings in Riddle Airlines. However, the Advisory Jury empaneled in this case was directed by the Court to answer this question and it gave this answer: '1. Did John Paul Riddle in his first telephone conversation with Mr. Reed on March 28, 1955, tell Mr. Reed that there was no market for the Riddle Airlines Stock.' Answer: 'No.' The Court agrees with the Jury and adopts this question and answer as its finding on the conflicting testimony on this point. * * *

* * * * * *

"24. The plaintiffs also contended at the trial that Mr. Riddle, as president and a director of Riddle Airlines, Inc., was under a fiduciary duty to the plaintiffs as stockholders to inform them on March 28, 1955 that Mr. Davis was going to become a purchaser of substantial amounts of stock. There is no evidence that on the date in question Mr. Riddle had knowledge that Mr. Davis was going to become a purchaser of substantial amounts of stock, and the testimony of both Mr. Riddle and Mr. Davis is to the contrary. However, at the trial the Court was of the opinion that there might be a fiduciary duty on the part of Mr. Riddle if inquiry was made to make such a disclosure to the plaintiffs if he had good reason to believe, at the time of his telephone conversation with Mr. Reed on March 28, 1955, that Mr. Davis was going to become a purchaser of substantial amounts of stock, other than the

stock of Judge Starnes. The Court, therefore, propounded to the Advisory Jury the following questions, to which it gave the following answer: '2. Did John Paul Riddle know, or have good reason to believe that at the time of that telephone conversation that Mr. Arthur Vining Davis was going to become a purchaser of substantial amounts of stock, other than the stock of Judge Starnes.' Answer: 'Yes.' The Court adopts the finding of the Jury to the extent of finding that on March 28, 1955, at the time of his telephone conversation with Mr. Reed, Mr. Riddle had good reason to believe that Mr. Davis was going to become a purchaser of substantial amounts of stock other than the stock of Judge Starnes.

"25. At the trial Mr. Reed denied that Judge Starnes had informed him who the purchaser of Starnes' stock was, and testified that Judge Starnes had merely told him that he had sold his stock *in* Riddle at a price of 55¢ per share. However, on cross-examination, it appeared that Mr. Reed had given a deposition at an earlier date in which he stated that Judge Starnes had told him that he had sold his stock to Riddle. The Court cannot accept the latter version since the documentary evidence in the form of the draft drawn by Judge Starnes shows that Judge Starnes was aware of the identity of the purchaser of his stock. Mr. Reed stated that Judge Starnes was a lifelong family friend and a very honorable man and no motive was even suggested as to why Judge Starnes would deliberately misinform Mr. Reed. It is, therefore, permissible to infer that Judge Starnes did in fact inform Mr. Reed of the the identity of the person to whom he had sold his stock.

"26. To strengthen his contention that he had not been informed by Judge Starnes on March 28, 1955 of the identity of the purchaser of

the Starnes stock, Mr. Reed testified at the trial that he never heard of the name of Arthur Vining Davis until *eight* or *nine months after* March 28, 1955. However, on July 5, 1955, he attempted to rescind the transaction of March 28 1955 (See the letter of the last mentioned date from the Austin National Bank to the Miami Beach First National Bank). The plaintiffs allege, in paragraph 7 of their claim for relief, that they rescinded the transaction after they learned of the transactions between Mr. Riddle and Mr. Davis. The Court is of the opinion that Mr. Reed's testimony about his conversation with Mr. Riddle was not persuasive as to the information requested or given, or that the attempted rescission was because of any concealment of the Davis' interest.

"27. The Court finds that Mr. Reed, if he did not have information as to the identity of Mr. Davis and his connection with transactions with the Starnes purchase on March 28th, did not rely on Riddle's statement, if there was such a statement, that there was no market, because Reed testified that Riddle said he had a man coming in to put up the money to buy the Texas group's stock, so Reed must have known of that prospective market (although Reed admittedly did not ask who that man was). The Court finds as a fact that the plaintiffs were not induced to enter into the transaction of March 28, 1955 by any misrepresentation or non-disclosure of a material fact by Mr. Riddle * * *."

Those findings were based upon testimony heard orally before the court. All of the witnesses testified in the presence of the district judge, except Mr. Davis who testified by deposition. Rule 52(a),

Federal Rules of Civil Procedure, 28 U.S.C.A., provides in pertinent part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■ After carefully studying this record, we cannot say that the findings of the district court are clearly erroneous. The spectacular rise in the price per share of the stock of Riddle Airlines subsequent to Riddle's purchase from Reed on March 28, 1955, was caused by Davis' continued purchases of stock, and goes to show that Riddle owed a duty to Reed to disclose the fact that Davis was interested; but that increase in price is not otherwise material, except in measuring damages. The very first purchase of a substantial block of stock was made in the name of Arthur Vining Davis from Judge Starnes, and Riddle had every right to believe that that fact was communicated to Reed. The district court inferred that it actually was so communicated. Clearly, we think, the district court properly found from the evidence that Reed knew that there was a market for the stock.

■ The specifications of error relating to rulings on evidence before the advisory jury and instructions to that jury need not be considered, because the function of that jury was simply to assist the judge, and " * * * the review on appeal is from the court's judgment as though no jury had been present." (American) Lumbermen's Mutual Casualty Co. v. Timms & Howard, 2 Cir., 1939, 108 F.2d 497, 500; see also, 5 Moore's Federal Practice, 2nd ed., Para. 39.10 [3] ; 7 Id.Para. 61.07 [2], p. 1021.

■ The district court fixed $1.50 per share as the market value of the undelivered shares of stock upon evidence outlined in its findings.[3] We cannot say

3. "29. On July 28, 1955, Mr. Riddle tendered the balance of the purchase price of the remaining half of the stock to the Miami Beach First National Bank

and became entitled to the delivery of the certificates on that date.

"30. The Court propounded to the Advisory Jury the following question and received the following answer: '4. What

that those findings were clearly erroneous. Indeed, the inferences seem to favor the appellants.

Finding no reversible error in the record, the judgment is

Affirmed.

was the market value of the Riddle Airlines stock on July 28, 1955, the date the defendant in the case, John Paul Riddle, tendered the remaining balance to Miami Beach First National Bank.' Answer: '$1.50 Dollars.' There was no evidence of the market value of the stock on July 28, 1955 in the record except that the record reflects, in Mr. Davis' tabulation of his stock purchases, that on June 28, 1955 he paid $2.75 per share for three blocks of stock, and that on October 21st

he acquired a block of 200,000 shares at a price of $1.50. The Jury may have concluded that this decline in price between June 28, 1955, and October 21, 1955 had already taken place by July 28, 1955, and the Court, therefore, adopts the finding made by the Advisory Jury above quoted."

