CARROLL, CHAS., Judge
(dissenting in part).
I concur in the denial of rescission to the plaintiff Foster Construction Company because the Foster stock was not sold to the defendants, but dissent from the majority judgment which affirmed the decree denying rescission to the plaintiffs William C. Rogers and Michael H. Lojinger.
The three plaintiffs sued John Paul Riddle and Riddle Airlines, Inc., for rescission of sales of their stock to defendants, alleging Riddle knew but failed to reveal inside information that Arthur Vining Davis was investing heavily in the company.
It was clearly established that Davis was prepared to and was then buying into the company on a large scale; that Riddle solicited and arranged for sale by plaintiffs of their stock, and that he did not reveal to them that Davis was interested in the company.
Riddle Airlines was a freight and cargo airline. Riddle was president and a director, and was its general manager. Plaintiffs were minority stockholders, and were not officers or directors in the company.
Arthur Vining Davis was a man of great wealth and chairman of the board of directors of Aluminum Corporation of America (Alcoa). It was common knowledge in Dade County that Davis had invested many millions of dollars in property and businesses in the area; and he was commonly regarded as a modern Croesus, with the Midas touch.
The denial of rescission by the chancellor was based mainly on two findings. One was that the plaintiff had failed to prove allegations that at the time Riddle negotiated the purchase and acquired stock from the plaintiffs Davis had contracted or “agreed” to buy a substantial amount of the company’s stock. The second finding was that when Riddle dealt with the plaintiffs for their stock he “had no such knowledge on any of these occasions, nor did he have any reason to believe that Mr. Davis was going to invest heavily in the stock of Riddle Airlines.” On that basis the chancellor concluded that Riddle did not fail to disclose “any material facts or any information concerning Mr. Davis.” Additionally, though not material to the decision,[1] the *411 chancellor found that of the stock obtained from the three plaintiffs only that purchased from Rogers was later sold to Davis, and that there was no prearrangement between Riddle and Davis that stock purchased from the plaintiffs was being procured for Davis.
This court in the majority opinion concluded that the findings of the chancellor had adequate support in the record. It is my opinion that the decree is unsupportable on the record because the findings on which it is based are contrary to the manifest weight of the evidence, and because the chancellor failed to give legal effect to the evidence. On so concluding, an appellate court should not hesitate to reverse the cause for an appropriate decree. See Holland v. Gross, Fla.1956, 89 So.2d 255, 258, 63 A.L.R.2d 920; Shaffran v. Holness, Fla.App.1958, 102 So.2d 35, 40; Talbot v. Talbot, Fla.App.1958, 104 So.2d 410, 412.
As to the first ground relied on by the chancellor, that the evidence failed to prove a contract or agreement made with Davis on or before March 31, 1955, to buy substantial amounts of stock, the learned chancellor appears to have been in error. First, I feel that he misjudged somewhat the allegations of the complaint. Instead of reading the complaint as alleging that by March 31 Riddle had induced Davis to buy substantial amounts of stock in the company, the chancellor construed the complaint to allege Riddle had induced Davis to contract or agree to buy. Secondly, whether or not he had previously agreed to do so, Davis did invest heavily in the corporation by March 31.[2]
If, as the chancellor read the complaint, it alleged that on or before March 31, 1955, Riddle and Davis had entered into a contract or agreement for Davis to buy the stock which he bought, and the plaintiffs, though not establishing such a contract, proved that Riddle as president possessed knowledge as an insider, of Davis’ interest in the company, which it was his duty to pass on to them, the pleadings should have been considered amended to conform to such proof, even in the absence of a motion therefor, under rule 1.15(b), F.R.C.P., 30 F.S.A.[3]
The second ground or finding of the chancellor appears clearly wrong on this record. That was the finding that on the dates involved, which were March 25 to March 31, 1955, Riddle had no reason to believe that Davis was going to invest heavily in the stpck of Riddle Airlines. To begin with, Davis had made an investigation of Riddle Airlines. He said he had done that himself, by asking officials of other airlines questions as to the nature and extent of the freight business conducted by Riddle Airlines. On Thursday, March 24, 1955, Riddle contacted Davis, made an appointment and went to see him on March 25, when he says he discussed getting *412 freight business for the company but did not discuss Davis’ buying into the company. However, Riddle said that on March 25 he sensed that Davis was interested in the company. It was not disclosed whether he sensed Davis’ interest because of some attitude displayed by Davis at that meeting or whether the news of Davis’ inquiries about the company had filtered through to him as president. On that same date, March 25, he called the plaintiff Lojinger and arranged to buy his 6,320 shares of stock in Riddle Airlines at 45 cents a share. He also contacted one or more other stockholders and discussed purchase of their stock but made no deal.
On Monday, March 28, Riddle again went to see Davis and this time he says they discussed Davis’ buying into the company. A whirlwind of activity on Riddle’s part followed; on that day he bought or arranged for the purchase of over 250,000 shares from various stockholders, including Rogers and Foster. Significant in this connection were the purchases Riddle made on March 28, after seeing Davis, from two Texas stockholders. By telephone he bought from Judge Starnes 60,000 shares of Riddle Airlines stock. He told Judge Starnes that Davis was buying, and Starnes sold direct to Davis, drawing a draft on Davis for the price of the stock. Davis paid that draft in Miami on March 31, and he received the stock.
Also, on March 28, by telephone to Texas, Riddle contracted for the purchase of the Reed stock amounting to 112,500 shares. Reed later refused to deliver, and sued to rescind for fraud. However, in that case the court found as a fact that Reed was informed on March 28 of the inside information Riddle had concerning Davis, if not by Riddle then by his friend and legal adviser Starnes who knew of it and who discussed the transaction with Reed that day. See Reed v. Riddle Airlines, 5 Cir., 1959, 266 F.2d 314, 315. But in the Reed case it was recognized as the law that Riddle, the president and general manager of the company, owed a fiduciary duty to a stockholder from whom he purchased stock of the company to disclose to the latter the knowledge he had as an “insider” which would affect the value of the stock. In the Reed case the court said:
“The appellants insist that, as president and general manager of the corporation, Riddle owed a fiduciary duty to the stockholders to disclose knowledge affecting the value of the stock which had come to his knowledge as an ‘insider,’ before purchasing the same from a shareholder. We agree, and have recently held to that effect in Mansfield Hardwood Lumber Company v. Johnson, 5 Cir., 263 F.2d 748, affirming a well-considered decision of Judge Ben C. Dawkins, Jr., of the Western District of Louisiana, reported in D.C., 159 F.Supp. 104 et seq. In this case that duty is emphasized by the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a, et seq., and by Rule X-10B-5 adopted by the Securities and Exchange Commission to supplement Section 10(b) of that Act. See Speed v. Transamerica Corporation, D.C.Del.1951, 99 F.Supp. 808, 828, 829. While we thus agree with the legal basis of appellants’ claimed right of rescission, we do not agree that the evidence established such a right under the applicable law.”
The inside information which Riddle had and which he was under a fiduciary duty to reveal to stockholders from whom he bought stock was that Arthur Vining Davis was interested in the company and buying stock in it. Further in the opinion in the Reed case, with reference to the effect which Davis’ participation had on the value of the stock, it was said (266 F.2d at page 319): •
“ * * * The spectacular rise in the price per share of the stock of Riddle Airlines subsequent to Riddle’s purchase from Reed on March 28, 1955, was caused by Davis’ continued purchases of stock, and goes to show that Riddle owed a duty to Reed to disclose *413 the fact that Davis was interested; * * *_»
Contrary to the chancellor’s finding, not only does the evidence show that Riddle had ample reason to believe Davis was going to invest heavily in the company, but shows that by the date alleged, of March 31, Davis already had invested heavily, and that Riddle well knew it.[4]
Moreover, the rights of plaintiffs to rescind did not depend on whether, when Riddle dealt with them, he knew that Davis was going to “invest heavily.” The fact that an Arthur Vining Davis was interested and was considering buying stock in the company would be vital inside information.[5] The further fact that Davis had started buying substantial blocks of stock clearly was within Riddle’s knowledge by March 28.[6]
Now as to the merits of the claims to rescind, as presented by the individual plaintiffs. The chancellor properly rejected the Foster claim because the sale which Riddle negotiated of the Foster stock was one to Skinner. Rescission was not sought against Skinner.[7]
Rogers was in the aircraft radio and electronics business, and dealt with Riddle Airlines. Riddle sent for him on March 25. Riddle first discussed sale of Rogers’ own business, then offered to buy Rogers’ stock in Riddle Airlines (25,000 shares), for 40 cents a share. Rogers said Riddle told him he “had a gentleman in from New York” who was interested in buying “a block about my size,” that the man’s son who was here was returning that night to New York and the man was going to California, and “he thought he could get me possibly as high as 55 cents a share for my stock.” Rogers did not agree to sell at that time. On the evening of the next day, Saturday, March 26, Rogers telephoned Riddle at his home and asked Riddle whether the man would pay 60 cents a share and Rogers quoted Riddle as saying, “Definitely not.” Thereafter, on Monday, March 28, Rogers called Riddle and informed him he would sell at 55 cents a share. Rogers said Riddle did not tell him about Davis being interested in the company, and Riddle did not testify that he did. Rogers said that on March 25, and also on March 30 when delivering the stock, he asked Riddle if anything had happened regarding the company and Riddle answered him in the negative.[8] This was not denied by Riddle. Rogers said he would not have sold if he *414 had known Davis was “on the verge” of making a purchase of stock in Riddle Airlines. Also, Riddle’s testimony showed that at the time he bought the Rogers stock on March 28, he planned and intended to resell it to Davis, and that he did so. The record shows that Riddle delivered Rogers’ 25,000 shares to Davis on March 30 and that Davis paid Riddle for it on March 31.
The plaintiff Lojinger was an aviation parts supplier who did business with Riddle Airlines. He held 6,320 shares of stock in the company. Riddle telephoned him on a date which he said was “the latter part of March” and which elsewhere was established as March 25. Riddle offered him 45 cents a share, representing it to be the current value, and, according to Lojinger, Riddle told him: “I have a man in from out of town that I am trying to get stock for.” [9] Lojinger said that having in mind doing more business with Riddle Airlines he agreed to sell his stock; that no mention was made of Arthur Vining Davis; and that had he known Davis was interested in the company he would not have sold his stock. Riddle did not contradict such testimony and when asked whether he told Lojinger about Davis said: “I don’t think so.” On March 30 Lojinger went to Riddle’s office to deliver the stock. Riddle was present and knew that Lojinger was there with the stock, but Riddle did not see him. He prepared a check for Lojinger which was given to him by a secretary to whom Lojinger then delivered the stock. Neither at the time the transaction was initially arranged on March 25, nor when it was closed on March 30, did Riddle disclose to Lojinger the information he had about Davis’ interest and activity in the stock of the company.
At the least, the plaintiffs proved that when the president bought their stock he knew Arthur Vining Davis was interested in Riddle Airlines, and that before he was handed the shares of stock by the plaintiffs Riddle had made purchases for Davis and was .negotiating sale to him of hundreds of thousands of dollars worth of treasury stock. Riddle did not disclose to Rogers and Lojinger the information which he, as an "insider” was under a fiduciary duty to divulge to them regarding the interest and participation of Davis; and in the purchase from Rogers that information was affirmatively withheld and denied. What was proved was ample for rescission. If the allegations were required to be construed as calling for greater proofs, this case should not have been dismissed for such a reason, but the complaint should have been considered amended to conform to the adequate proof. I would affirm the decree as against the appellant Foster Construction Company, and reverse it with directions to enter a decree for rescission in favor of the appellants Rogers and Lojinger.

. A stockholder’s right to rescind a sale made to or through the president, for the latter’s failure to disclose inside information that Davis was interested in buying into the corporation, which could affect the value of the stock, was not dependent upon transfer of such stock to Davis. ITor the president to get it for himself or another to hold under those conditions would make it equally if not more amenable to rescission. Under those circumstances it would be immaterial, to a right to rescind such a sale, that the president who bought it had made no agreement with Davis to resell it to him. The material information was that Davis was interested in the company and was buying or about to buy sub *411 stantial blocks of stock of the company, regardless of the origin of the shares he bought.

. The record of Davis’ purchases, in evidence, shows that between the dates of March 28 and March 31, 655,500 shares of Riddle Airline stock either were delivered to Davis or paid for by him; and also the amount which Davis actually paid for stock on March 31 and that he paid later for other stock which he received on March 31, aggregated the sum of $483,274. The record shows that on March 31, Davis paid for the Starnes stock, 60,000 shares, and paid Riddle for 25,000 shares (which Riddle had just bought from Rogers), and also paid Riddle on March 31 for an additional 110,000 shares (at 65 cents a share). The rec-orcl then discloses more stock received by Davis on March 31 which was paid for the following day. That included 60,500 shares from Riddle, and 400,000 shares (at 85 cents a share) from Riddle Airlines.

. “When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment or decree; but failure so to amend shall not affect the result of the trial of these issues. * * * ”

. See footnote 2.

. A stock analyst testified that the value of the stock increased fz-om around 44 (40 bid — 44 asked) on March 25 to 75 “bid” on March 31, and had increased to $3.35 “bid” within a month. Davis left no doubt that the increase in the value of the stock was due to his buying. He testified:
“Q. * * * Do you know of anything in the Riddle Company’s position which would have caused the stock to advance in price from the time you made your purchase in March to the following June or July? A. No. I don’t think there was anything in the company. The more I bought, the higher it went; that’s all.
“Q. Do you think that the fact that you were buying the stock had anything to do with the rise of the stock? A. Everything.
“Q. That a person of your fmancial stature would be interested in buying stock in that company would naturally cause the stock to go up, wouldn’t it? A. Yes.”

. See footnote 2.

. A part of Skinner’s deposition which included his testimony that he resold the Foster stock to Davis the day he got it, was introduced in evidence by plaintiffs but later withdrawn. Riddle’s testimony showed that Skinner was given an option to purchase 25,000 shares of the company’s stock at a favorable price, as a reward for his services in helping Riddle “interest” Davis.

. Rogers testimony relating to the March 25 conference with Riddle included the following: “Q. Was anything said in the conversation either by you or by Mr. Riddle concerning the condition of the company or the value of the stock? A. Yes, at the time wo were discussing it— how much freight the airline was carrying, Mr. Riddle had in front of him, which was behind the seat I had, these *414 photographic charts showing how much cargo the air line was carrying per month on a yearly basis and against the year before, and I asked Mr. Riddle how the airline was doing; and when he asked me about buying my stock, I had asked him — When he asked me about buying my stock, I asked him, ‘Did anything happen to Riddle Airlines?’ He said, ‘It has not,’ and we went into the conversation about this other gentleman from New York. Q. At that time, had you ever heard of Mr. Arthur Y. Davis? A. Yes, I had heard of Mr. Davis. * * * » in the course of a talk had with Riddle when he delivered the stock at Riddle’s office on March 80, Rogers testified: “ * * * I got my stock out [from safety deposit box] and took my stock over to Mr. Riddle at Riddle Airlines on the 30th, went back in his office with my stock and started to talk about the airline again, and I had this information that my O.P.A. had jotted down about the valuation of my corporation. Q. What was the conversation that you had? A. I asked Mr. Riddle again before I turned my stock over to him, ‘Was there anything that happened to Riddle Airlines?’ He told me, ‘No.’ I gave him my stock at that time; he said there was something wrong with the stock, the way it was made out. He said he could take care of it. Then he gave me a receipt for my stock — 55 cents a share.”

. The man referred to in that statement was never identified. Davis lived and was present in Dade County.