Edwin J. HERPICH, et al., Plaintiffs-Appellants,

v.

Robert H. WALLACE, Jack E. Love, et al., Defendants-Appellees.

No. 27729.

United States Court of Appeals, Fifth Circuit.

July 14, 1970.

J. Vernon Patrick, Jr., F. Don Siegal, Birmingham, Ala., Robert Kleinpeter, Baton Rouge, La., for plaintiffs-appellants.

R. Gordon Kean, Jr., Frank J. Polozola, Baton Rouge, La., John P. Frank, Phoenex, Ariz., A. G. Seale, Baton Rouge, La., for defendants-appellees.

Before AINSWORTH, DYER and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

In this case we must determine whether minority shareholders of a Louisiana corporation have stated a claim for relief under various sections of the federal securities laws which entitles them to challenge in federal court, absent diversity, the way in which control of their corporation was sold to an Arizona-based complex of insurance companies. The District Court dismissed their complaint on the pleadings, thus relegating them to the state courts. This appeal requires us to consider basic aspects of the implied right of action for violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and, more particularly, SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, which right was recognized by this Court in Reed v. Riddle Airlines, 5 Cir., 1959, 266 F.2d 314. The principal issues with which we deal are (1) the standing of plaintiffs to bring this suit under Rule 10b-5 and (2) the extent to which the conduct about which plaintiffs complain is actionable under the rule. In addition, we are asked to recognize various implied rights of action under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*

Plaintiffs are shareholders of National American Life Insurance Company, a Louisiana corporation. Plaintiffs brought this suit on behalf of themselves and similarly situated National American shareholders, and derivatively on behalf of National American. It is a companion to Herpich v. Wilder, 5 Cir., 1970, 430 F.2d 818 [No. 27385], also decided today by this Court. The principal defendants, referred to as the "Arizona Group," control the present management of National American. Some two or more years ago, the Arizona Group ventured South in search of acquisitions. Following their purchases of control of various insurance companies, among which was National American, they were met with numerous lawsuits challenging their means of acquiring these companies. This action is directed primarily against the purchasers of control of National American. Herpich v. Wilder, on the other hand, is directed against the seller of control.

The Arizona Group is comprised of National Securities, Inc. (NSI), Old National Life Insurance Company, Robert

H. Wallace, and Jack E. Love. NSI, a Colorado corporation, has its headquarters in Arizona and carries on business through several wholly or partially owned subsidiary or affiliated corporations, including insurance companies. A majority of NSI's stock is owned by Old National, an Alabama corporation. Old National is said by plaintiffs to be wholly owned by a voting trust of which Wallace and Love are equal beneficiaries. The non-Group defendants here are Luther D. Harris, a director and "controlling person" of National American since 1963, and Raymond A. Latta, who from time to time has served as a consulting actuary to National American.

Plaintiffs' four-count complaint, as amended, alleges violations of section 10 (b) of the Exchange Act, Rule 10b–5, section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), various sections of the Investment Company Act, and applicable state law. Plaintiffs seek damages and injunctive relief where appropriate for themselves and the class of National American shareholders they seek to represent, and also on behalf of National American itself. Federal jurisdiction is predicated upon section 27 of the Exchange Act, 15 U.S.C. § 78aa, section 22 of the Securities Act, 15 U.S.C. § 77v, and section 44 of the Investment Company Act, 15 U.S.C. § 80a–43.[1] In the court below, defendants filed motions to dismiss for want of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. The District Judge granted these motions, and plaintiffs appeal.

## I.

From the amended complaint, sworn affidavits, and attached documents,[2] the following allegedly occurred: Until January 24, 1968, Robert E. Wilder, who is not a defendant in this case,[3] was the majority shareholder of First Colonial Corporation of America. First Colonial is an "investment company" within the meaning of the Investment Company Act of 1940,[4] but has never complied with the registration and qualifications imposed upon such companies by that act. Wilder owned 55.39 per cent of First Colonial's outstanding common stock. This stock was worthless except for the value of First Colonial's controlling interest in National American. Wilder, as a result of his stockholdings in First Colonial (which owned 26.81 per cent of National American's outstanding common stock), and in National American itself (6.32 per cent of the outstanding common), was in working control of National American. He exercised his power of control over the two corporations as president, director, and chairman of the board of National American and as president and director of First Colonial. This power of control was for sale.

### A. The Sale of Control

In late November 1967, Wilder allegedly conspired and agreed with the Arizona Group to defraud National American and the other National American shareholders and to cause National American to transact business with the unregistered investment company that controlled it. Wilder would transfer control of National American to the Arizona Group at a

---

1. Plaintiffs also sought to invoke the pendent jurisdiction of the District Court, see, e. g., United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and cited 28 U.S.C. § 1337.

2. After the Court had heard oral argument in this and the related Arizona Group cases decided today, both sides filed supplemental memoranda with the Clerk. Sworn affidavits and attached copies of purported documents were also

filed by plaintiffs, who allege that they obtained the information filed as a result of discovery in other Arizona Group cases proceeding in the federal and state courts.

3. Plaintiffs filed a complaint against Wilder in the Middle District of Alabama. Herpich v. Wilder, M.D.Ala., 1969, Civ. No. 2747–N, rev'd, 5 Cir., 1970, 430 F.2d 818 [No. 27385].

4. Investment Company Act of 1940, § 3, 15 U.S.C. § 80a–3.

premium price payable to him in part by National American itself. This would be done by causing National American to acquire by indirection some of Wilder's shares of National American and First Colonial stock at a price in excess of the market value of these shares. This result was to be accomplished by means of the following device: NSI would be caused to purchase all of Wilder's shares of National American and First Colonial stock at a price, payable in NSI notes, at least $3,000,000 in excess of the then market value of these shares; the Arizona Group would then cause Alabama National Life Insurance Company, an Alabama corporation they controlled,[5] to replace the notes issued by NSI to Wilder with premium debentures of its own; finally, the Arizona Group would cause a merger into one company of Alabama National, National American, and another Arizona Group corporation. As a further inducement to Wilder, the Arizona Group would cause to be issued to him an option to purchase 54 per cent of the outstanding common stock of Capitol National Bank of Montgomery, Alabama. In return, Wilder would resign his positions at National American and facilitate the election of Wallace and Love and their associates to management positions there.

To carry out their plans, defendants, either as principals or as aiders and abettors, are alleged to have caused the following to be done: NSI and Wilder executed an agreement under which Wilder sold his First Colonial and National American stock to NSI for $5,000,000. This price was $3,000,000 in excess of the then market value of the stock. The Arizona Group paid this premium to acquire control of National American. Control was sought to enable the Arizona Group to loot the corporation and otherwise to waste the corporation's assets to the detriment of the corporation and its shareholders. The Group did not of-

fer to purchase National American stock from plaintiffs or other members of plaintiffs' class on the same terms given Wilder. Defendants next caused National American and First Colonial to execute an agreement with Federated Investments, Inc. Under this agreement, First Colonial, then insolvent, was to purchase from Federated Investments 43,-200 shares of Capitol National Bank of Montgomery stock for $1,188,000. Purchase of these shares, which constituted 54 per cent of the outstanding common stock of the bank, was guaranteed by National American. On or about January 24, 1968, defendants caused NSI to grant Wilder an option to purchase these same shares of bank stock. This option was given as partial payment of the price due Wilder for his First Colonial and National American stock. Because defendants cast the transfer of control of National American as a sale of stock from Wilder to NSI, Wilder realized a premium for passing control of National American's assets which was not made available to or enjoyed by the other shareholders of National American.

B. *The Harris Transaction*

The facts alleged by plaintiffs are as follows: When the Arizona Group acquired control of National American in January 1968, they caused the corporation to continue to honor its obligations under an agreement it made with Harris on February 24, 1967. Under this agreement, National American was to purchase 12,947 shares of First Colonial common stock from Harris, then a National American director, for the excessive price of $100,000. This stock was then worthless. Documents were drawn to indicate that the transaction was a loan by National American to Harris which was secured by a pledge of Harris' stock. The principal amount of the purported loan was to be paid to Harris at the rate of $2,500 a month. In the

---

5. The way in which the Arizona Group acquired Alabama National is being challenged by minority shareholders of that corporation in the Hensley group of cases.

*E. g.*, Shell v. Hensley, 5 Cir., 1970, 430 F.2d 818 [Nos. 27447 and 27514]; Hensley v. Love, N.D.Ala., 1969, 298 F.Supp. 698.

event Harris defaulted, National American agreed that it would not assert a deficiency against the director regardless of the value of the pledged stock at the time of the default. The Arizona Group continues to cause the corporation to disburse $2,500 to Harris each month, thereby causing the corporation to purchase worthless stock. It does not appear that Harris is in default on the purported loan.

### C. The Latta Transaction

Plaintiffs' allegations show the following: On or about April 18, 1967, National American was caused by Latta to arrange the payment of $100,000 to Latta by the device of guaranteeing a "loan" by an unnamed person to Latta in that amount. This purported loan was made to finance Latta's purchase of 20 per cent of the outstanding stock of Dawl Corporation, a Louisiana corporation then owned in part by Wilder. The Dawl stock purchased by Latta was pledged as security for the so-called loan. Subsequently, on or about July 1, 1967, Latta exchanged his Dawl stock for First Colonial stock. Although this First Colonial stock is not worth the amount Latta owes on the loan, National American was caused to agree to the substitution of this stock for the Dawl stock as security for the loan. In connection with the $100,000 transaction, National American was caused to agree to pay Latta $45,000 for no consideration whatever to the corporation. It is not alleged that Latta is in default on the loan of $100,000.

### D. Mismanagement of National American and the Proposed Merger

Since acquiring control of National American, it is alleged that the Arizona Group, aided and abetted by Latta and Harris, have wasted the assets of the corporation. They intend to engage in similar wasting in the future. Moreover, defendants propose to merge National American, Alabama National, and another corporation the Group controls into one company at terms disadvantageous to National American and the shareholders of National American. Specifically, National American will be caused by the terms of the merger to acquire Wilder's First Colonial and National American stock at the excessive price NSI paid to Wilder for selling control of National American in the first place. To carry out this plan, defendants solicited proxies by mail in September 1968 to elect their nominees to the board of National American. These proxies are said to have been misleading in some manner not pleaded with particularity.

With respect to all wrongs alleged in the complaint, plaintiffs, one of whom was a director of National American, aver that they did not discover the facts they allege until February 14, 1968. Plaintiffs state that they could not have discovered these facts earlier by the exercise of any duty imposed upon them because defendants and those in conspiracy with defendants concealed and misrepresented the facts to prevent National American shareholders from discovering the fraud and deceit being practiced upon them.

All four counts of the amended complaint allege that defendants, either as principals or as aiders and abettors, have in various ways violated section 10 (b) of the Securities Exchange Act of 1934 and, more particularly, Rule 10b-5, promulgated thereunder by the Securities and Exchange Commission (SEC).[6] Count one also alleges violations of the

---

6. Violations of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), are also alleged. In this case, however, we need not reach the question whether an implied right of action should be recognized for violations of section 17(a), since section 10(b) of the Exchange Act and Rule 10b-5 thereunder will support as well as would section 17(a) an action for any monetary or injunctive relief to which plaintiffs or their corporation may be entitled. See, e. g., Globus v. Law Research Service, Inc., 2 Cir., 1969, 418 F.2d 1276, 1283. See also 3 and 6, Loss, Securities Regulation 1778–1791 (2d ed. 1961), 3907–3915 (Supp. to 2d ed. 1969). Consequently, we pretermit discussion of section 17(a) in this opinion.

Investment Company Act of 1940. The allegations of count one relate primarily to the sale of control by Wilder to the Arizona Group and the means by which this sale was and is being financed. Count two involves the Harris transaction, while count three involves the Latta transaction. Finally, count four, incorporating the allegations of count one by reference, relates primarily to the proposed merger of National American and other Arizona Group corporations into one company. Counts one, two, and three seek damages. Counts two and four seek injunctive relief. Use of the mails is alleged in all counts.

For reasons that follow, we conclude that plaintiffs have stated claims that are triable in the federal courts. Accordingly, without making any suggestion how this case should be determined on the merits, e. g., Orr v. Thorpe, 5 Cir., 1970, 427 F.2d 1129; Merlite Land, Sea & Sky, Inc. v. Palm Beach Investment Properties, Inc., 5 Cir., 1970, 426 F.2d 495; Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir., 1970, 421 F.2d 1313, we reverse in part the judgment of the District Court and remand the case for further proceedings not inconsistent with this opinion.

## II.

Defendants contend that the "ultimate wisdom" on this case is that the complaint represents an attempt to bring a large state-law derivative action, absent diversity, into federal court on a poor 10b–5 theory.[7] They argue that plaintiffs lack standing to invoke the private right of action afforded by section 10(b) of the Exchange Act and Rule 10b–5 and that the conduct about which plaintiffs complain is not within the coverage of the section and the rule.

This Court has infrequently had occasion to consider 10b–5 theories, poor or otherwise.[8] Consequently, in determining the questions of standing and coverage presented in this case, we proceed on a relatively unmarked trail. We are, however, not without some guidance, directed as we are by decisions from this and other Circuits and the "familiar canon of statutory construction that remedial legislation [such as the Exchange Act] [9] should be construed broadly to effectuate its purposes." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); Bunn v. Global Marine, Inc., 5 Cir., 1970, 428 F.2d 40.

■■■ Section 10 of the Exchange Act, entitled "Regulation of the Use of Manipulative and Deceptive Devices," reads in relevant part as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security \* \* \*, any manipulative or deceptive device or contrivance in

7. Defendants take their contention from a statement made by District Judge Frank M. Johnson, Jr., in the order dismissing plaintiffs' original complaint in the Wilder case [No. 27385]: "\* \* \* [I]t is only fair to note that this Court considers the present complaint an attempt to bring a large state law derivative action, absent diversity, into federal court on a poor 10b–5 theory." Herpich v. Wilder, M.D. Ala., 1968, Civ. No. 2747–N.

8. Various aspects of the rule have been considered in the following cases: Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; Kuehnert v. Texstar Corporation, 5 Cir., 1969, 412 F.2d 700; Lehigh Val-

ley Trust Co. v. Central Nat. Bank of Jacksonville, 5 Cir., 1969, 409 F.2d 989; Grumbles v. Times Herald Printing Co., 5 Cir., 1968, 387 F.2d 593; Azalea Meats, Inc. v. Muscat, 5 Cir., 1967, 386 F.2d 5; Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195; Reed v. Riddle Airlines, 5 Cir., 1959, 266 F.2d 314.

9. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). See also Loomis, The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940, 28 Geo.Wash. L.Rev. 214 (1960).

contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

By section 10(b) Congress meant to prevent manipulation and control of the prices at which securities are bought and sold and to enable buyers, sellers, and traders of securities to make a proper appraisal of the value of securities. Securities Exchange Act of 1934, § 2(3), 15 U.S.C. § 78b(3). See also Hearings on Stock Exchange Regulation Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. (1934); Ruder, Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?, 57 Nw.U.L.Rev. 627, 657 (1963).[10] Thus the section reflects the design of the Exchange Act as a means for preventing inequitable and unfair practices on securities exchanges and over-the-counter markets and for insuring fairness and honesty in securities transactions generally. 48 Stat. 881; see SEC v. Texas Gulf Sulphur Co., 2 Cir., 1968, 401 F.2d 833, 847–848 (en banc). A fundamental purpose of the Act was "to substitute a philosophy of full disclosure for the philosophy of caveat emptor." SEC v. Capital Gains Research Bur., 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963); see Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); Azalea Meats, Inc. v. Muscat, 5 Cir., 1967, 386 F.2d 5, 8. Congress sought to protect persons "who would be engaged in buying and selling and trading in * * securities as broadly defined in the Act." Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195, 202. It did not make section 10(b) self-executing, nor did it limit the section's application to the manipulative and deceptive devices or contrivances known in 1934. Instead, it wrote the section as a "catch-all" meant to reach practices employed in connection with the purchase or sale of securities which were contrary to the public interest or the interest of investors. See Hearings on Stock Exchange Regulation Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 115 (1934).[11] To the SEC was granted rule-making authority to define that which Congress made unlawful in section 10(b) —namely, the use, in connection with the purchase or sale of securities, of "manipulative or deceptive devices or contrivances."

Rule 10b–5, entitled "Employment of Manipulative and Deceptive Devices," reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The SEC adopted Rule 10b–5 in 1942 to close a "loophole in the protections

---

10. This is not to say, however, that section 10(b) is limited to manipulative or deceptive devices employed with respect to the investment value of securities. See Hooper v. Mountain States Securities Corp., 5 Cir., 1960, 282 F.2d 195; A. T. Brod & Co. v. Perlow, 2 Cir., 1967, 375 F.2d 393.

11. "The Administration's spokesman needed only a single sentence to dispose of the somewhat broader version of [§ 10(b)] which was § 9(c) of the original 1934 bills: 'Subsection (c) says, "Thou shalt not devise any other cunning devices."'" 3 Loss, Securities Regulation 1424 (2d ed. 1961). See also, Ruder, Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?, 57 Nw.U.L. Rev. 627 (1963).

against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase." SEC Sec.Exch.Act Rel.No.3230 (May 21, 1942). The purpose of the rule, it seems clear, was to afford sellers of securities the same protections already afforded purchasers by the federal scheme of securities regulation. Previously, fraud on sellers, as distinct from fraud on purchasers, *see* Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a), was not covered by the securities acts unless committed by an over-the-counter broker or dealer. 8 SEC Ann.Rep. 10 (1943); *see* Securities Exchange Act of 1934, § 15(c), 15 U.S.C. § 78o(c). Viewing the rule as an "additional protection to investors," 8 SEC Ann.Rep. 10 (1943), the Commission fashioned it to "make applicable to the purchase of securities, the same broad antifraud provisions which the Congress has imposed in Section 17 (a) of the Securities Act of 1933, in connection with the sale of securities." Ward La France Truck Corp., 13 S.E.C. 373, n. 8 (1943). To accomplish this end the Commission simply copied the language of section 17(a) of the Securities Act, with exceptions unimportant in this context, and applied it "in connection with the purchase or sale of any security," this being the reach of section 10(b). *See also* Birnbaum v. Newport Steel Corp., 2 Cir., 1952, 193 F.2d 461, 463; 3 and 6 Loss, Securities Regulation 1424–1427 (2d ed. 1961), 3617 (Supp. 2d ed. 1969).

Together the section and the rule aim at reaching "misleading or deceptive activities, whether or not they are precisely and technically sufficient to sustain a common law action for fraud and deceit," Cady, Roberts & Co., 40 S.E.C. 907, (1961), carried on "in connection with" the purchase or sale of securities. They are not intended as a specification of particular acts or practices that constitute "manipulative or deceptive devices or contrivances," but are instead designed to encompass the infinite variety of devices that are alien

to the "climate of fair dealing," SEC v. Capital Gains Research Bur., 375 U.S. 180, 201, 84 S.Ct. 275, 288, 11 L.Ed.2d 237 (1963), that Congress sought to create and maintain. *See* A. T. Brod & Co. v. Perlow, 2 Cir., 1967, 375 F.2d 393, 397; Cady, Roberts & Co., 40 S.E.C. 907 (1961). The operative terms of Rule 10b–5—"fraud," "deceit," "purchase," "sale," and "security," as well as the phrase "in connection with"—are infused with special meanings. Their construction, the Supreme Court has admonished, must be broad and flexible so that the remedial purposes of the section and the rule will be effectuated. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); SEC v. Capital Gains Research Bur., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In this area especially, therefore, a case-by-case approach is necessary to the proper development of controlling precedent.

Where, as in this and the other Arizona Group cases decided today, serious questions of public law are presented on pleadings alone, we proceed cautiously, lest we are pulled into academic exercises in a case that factually may never be. Pred v. Board of Public Instruction of Dade County, Fla., 5 Cir., 1969, 415 F.2d 851. For purposes of this appeal, the well-pleaded allegations of plaintiffs' amended complaint must be taken as true. Walker Process Equip. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir., 1969, 417 F.2d 203. Moreover, "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U. S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *See also* Barber v. Motor Vessel "Blue Cat," 5 Cir., 1967, 372 F.2d 626. We turn now to decide the ques-

tions of standing and coverage presented.

## III.

### A. *Count One*

Plaintiffs contend that count one presents three interlocking but separate foundations for private actions under section 10(b) and Rule 10b–5. These foundations are as follows:

(1) National American and its shareholders other than defendants are said to have been defrauded "in connection with" Wilder's sale of securities to the Arizona Group. Because Wilder and the Group defendants cast the sale of control of National American in the form of a sale of Wilder's stock at a premium over market value, Wilder is said to have diverted a corporate opportunity to himself, aided and abetted by the other conspirators, in fraud of the corporation and its other shareholders.

(2) National American and its shareholders other than defendants are said to have been damaged as a result of acts done by defendants in furtherance of their scheme to cause National American indirectly to purchase Wilder's stock in First Colonial and National American. Specifically, it is claimed that defendants agreed as part of their conspiracy that Wilder would transfer control of National American to the Arizona Group for the purpose of enabling the Group to loot the corporation and otherwise to waste its assets. The inducement to Wilder was the premium of $3,000,000 ultimately to be paid by National American itself. As a party to the "plan" to merge National American and Alabama National into one company—thereby causing National American to purchase Wilder's stock at the premium price—National American is said to be a "purchaser" defrauded "in connection with" its purchase of securities.

(3) As an integral part of the conspiracy between Wilder and the Group, National American was caused to guarantee a promise of First Colonial, then insolvent, to purchase 43,200 shares of Capitol National Bank stock from Federated Investments. Subsequently, NSI granted Wilder an option to purchase the same bank stock. The guarantee by National American is said to constitute a "purchase" "in connection with" which National American has been defrauded.

We consider these three purported bases for a Rule 10b–5 civil action insufficient support for plaintiffs' argument that they are persons entitled to sue on behalf of themselves and their class of National American shareholders for rule violations based upon the allegations of count one. This is not to say, however, that plaintiffs have not stated a 10b–5 claim for relief on behalf of their corporation. As we shall discuss, count one does support a claim for derivative relief on behalf of National American. But on their own behalf, plaintiffs do not claim that they or other members of their class purchased or sold securities in connection with defendants' alleged employment of manipulative or deceptive devices or contrivances; nor do they claim that their damage resulted from their participation in a securities transaction. Therefore, for reasons that follow, we conclude that they are not entitled to bring an action under Rule 10b–5 on behalf of themselves or their class, as distinct from a derivative action on behalf of National American, on the facts alleged in count one.

Private actions (as opposed to SEC actions) brought to enforce liabilities and duties created by the section and the rule have been recognized by this Court since 1959. Reed v. Riddle Airlines, 5 Cir., 1959, 266 F.2d 314. The private right of action implied under Rule 10b–5 may be invoked on behalf of a corporation in a shareholder's derivative suit. Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; *see, e. g.,* City National Bank of Fort Smith, Arkansas v. Vanderboom, 8 Cir., 1970, 422 F.2d 221; Condon v. Richardson, 7 Cir., 1969, 411 F.2d 489; Schoenbaum v. Firstbrook, 2 Cir., 1968, 405 F.2d 215 (en banc); *cf.* Surowitz v. Hilton Hotels Corporation, 383 U.S. 363, 86 S.Ct. 845,

15 L.Ed.2d 807 (1966); J. I. Case Company v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195, 201, we based our recognition of the private right on the principles set forth in the landmark case of Kardon v. National Gypsum Co., E.D.Pa., 1946, 69 F.Supp. 512. Foremost among these principles is the common-law tort doctrine that a person injured by violation of a statute enacted for the benefit of persons in his position may bring his own action seeking redress for the harm caused him. Kardon v. National Gypsum Co., *supra* at 513; *see* Restatement of Torts § 286 (1938). *See also* Bromberg, Securities Law: Fraud—SEC Rule 10b–5, § 2.4 (1) (a) (1967). Supporting this doctrine is the policy undergirding the Exchange Act of providing complete, effective enforcement of the duties and liabilities imposed by the Act. *See, e. g.*, Ellis v. Carter, 9 Cir., 1961, 291 F.2d 270, 274. The SEC deems itself unequipped to make persons whole who have been injured by violations of Rule 10b–5; it seeks only to deter violators of the rule by making violations unprofitable. Brief for the SEC as Amicus Curiae, in Dolgow v. Anderson, E.D.N.Y., 1968, 43 F.R.D. 472, 483. Moreover, the Commission has neither the manpower nor the time that completely effective enforcement of the securities laws by it alone would require. Consequently, private actions brought for violations of the rule serve as a "necessary supplement to Commission action." J. I. Case Company v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). As in other contexts, the possibility of monetary damages or injunctive relief in a private action can be a most effective weapon in the enforcement of the antifraud provisions, section 10(b) and Rule 10b–5.

The volume of private litigation under section 10(b) and Rule 10b–5 has increased spectacularly in recent years; With this increase have come an "extraordinary expansion of subject-matter coverage" by the section and the rule and the possibility of "extraordinarily great liability" for their violation. Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; *see* Mutual Shares Corporation v. Genesco, Inc., 2 Cir., 1967, 384 F.2d 540, 543 n. 6. As the substantive law of Rule 10b–5 develops, a continuing problem confronting the courts concerns the nature of the protection created by the rule, that is, how far should that protection be extended.

In recognizing a private right of action and its corollary, implied civil liability, for violations of Rule 10b–5, courts have a duty to provide such remedies as are necessary to make effective the congressional purpose behind the section and the rule. J. I. Case Company v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942). The broad remedial purposes of the Exchange Act suggest that the relief made available should not be limited to a particular type of remedy. J. I. Case Company v. Borak, *supra;* Mutual Shares Corporation v. Genesco, Inc., 2 Cir., 1967, 384 F.2d 540, 547. In the formulation of relief, however, concepts of fairness to those who are expected to govern their conduct under Rule 10b–5 should be considered. Protection for investors is of primary importance, but it must be kept in mind that the nation's welfare depends upon the maintenance of a viable, vigorous business community. Considered alone, the sweeping language of Rule 10b–5 creates an almost completely undefined liability. All that the rule requires for its violation is that someone "do something bad," Jennings & Marsh, Securities Regulation 961 (2d ed. 1968), in connection with a purchase or sale of securities. Without further delineation, civil liability is formless, and the area of proscribed activity could become so great that the beneficial aspects of the rule would not warrant the proscription. *See* Ruder, Pitfalls in the Development of a Federal Law of Corporations by Implication Through Rule 10b–5, 59 Nw.

U.L.Rev. 185, 207–208 (1964). In recognition of this problem, courts have sought to construct workable limits to liability under section 10(b) and Rule 10b–5 which will accommodate the interests of investors, the business community, and the public generally.[12] At the threshold, the problem has been to determine the class of persons who are entitled to bring a private action under the section and the rule. To that problem we now turn.

 The standing of a private plaintiff to sue for violations of section 10(b) and Rule 10b–5 is to be decided, of course, within the framework of Article III of the United States Constitution, which restricts federal judicial power to "cases" and "controversies." Association of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The law of standing has been concerned almost entirely with public law questions such as determinations of constitutionality and review of administrative or other governmental action. Every plaintiff in the federal courts, however, must satisfy the court that he is a proper party to maintain the action he brings— that he has a personal stake in the outcome of the controversy. *See* Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). "The various rules of standing applied by federal courts have not been developed in the abstract. Rather, they have been fashioned with specific reference to the status asserted by the party whose standing is challenged and to the type of question he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). In the context of a plaintiff seeking to invoke a remedy afforded by section 10(b) of the Exchange Act and Rule 10b–5, "[t]he first question is whether the plaintiff alleges that the challenged [conduct] has caused him injury in fact, economic or otherwise." Association of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The second question is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected" by section 10(b) and Rule 10b–5 thereunder. 397 U.S. at 153, 90 S.Ct. at 830. *See also* Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

 When Congress vested federal district courts with exclusive jurisdiction of "all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder," Securities Exchange Act of 1934, § 27, 15 U.S.C. § 78aa, it must necessarily have assumed that this jurisdiction would be invoked only by those showing injury of the type that the Act seeks to prevent. *Cf.* SEC v. General Time Corp., 2 Cir., 1968, 407 F.2d 65, 71. Section 10(b) and Rule 10b–5 do not proscribe all fraudulent schemes concocted to take undue advantage of investors, but only those fraudulent schemes that are em-

---

12. "Thus, a requirement of privity was at first suggested, see Joseph v. Farnsworth Radio & Television Corp., 99 F.Supp. 701 (S.D.N.Y.1951), aff'd per curiam, 198 F.2d 883 (2d Cir. 1952), but has more recently been ignored, e. g., Cochran v. Channing Corp., 211 F.Supp. 239, 243–245 (S.D.N.Y.1962); see Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y.1964)." Mutual Shares Corporation v. Genesco, Inc., 2 Cir., 1967, 384 F.2d 540, 543, 544 (footnotes omitted).

Other limitations have included requirements (1) that the plaintiff actually has relied upon the allegedly fraudulent statement, List v. Fashion Park, Inc., 2 Cir., 1965, 340 F.2d 457, 462–463, (2) that reliance was reasonable, Rogen v. Ilikon Corporation, 1 Cir., 1966, 361 F.2d 260, 266–267, (3) that the fraud was the cause in fact of the plaintiff's harm, Barnett v. Anaconda Company, S.D.N.Y., 1965, 238 F.Supp. 766, 776, and (4) that the plaintiff's harm was foreseeable, Vine v. Beneficial Finance Co., 2 Cir., 1967, 374 F.2d 627, 635.

ployed "in connection with the purchase or sale of any security." Congress, when it used the quoted language, did not intend necessarily to require a purchase or sale of securities by the alleged violator as a precondition to the establishment of a violation of the section and the rule, but meant instead to outlaw the employment of manipulative or deceptive devices or contrivances, however novel or atypical they might be, "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell * * * securities." SEC v. Texas Gulf Sulphur Co., 2 Cir., 1968, 401 F.2d 833, 860 (en banc). The objectives of section 10(b) are purity of the securities transaction and the securities trading process. Congress was concerned with preventing injury to buyers and sellers of securities, and the basic interest sought to be protected was that of persons engaged in "buying and selling and trading in * * * securities as broadly defined in the Act," Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195, 202, to transact in securities in a "climate of fair dealing." SEC v. Capital Gains Research Bur., 375 U.S. 180, 201, 84 S.Ct. 275, 288, 11 L.Ed. 2d 237 (1963); see Birnbaum v. Newport Steel Corp., 2 Cir., 1952, 193 F.2d 461, 464. In short, Congress meant to afford investors a reasonable opportunity to make knowing, intelligent decisions regarding their purchases and sales of securities in unmanipulated markets, see Kahan v. Rosenstiel, 3 Cir., 1970, 424 F.2d 161, 173, and the loss resulting in connection with purchases or sales made without benefit of such an opportunity is the type of injury section 10(b) and Rule 10b–5 seek to prevent. See Mutual Shares Corporation v. Genesco, Inc., 2 Cir., 1967, 384 F.2d 540, 546. See also Britt v. Cyril Bath Company, 6 Cir., 1969, 417 F.2d 433, 435.

We are of the opinion that only purchasers and sellers of securities involved in an alleged Rule 10b–5 violation—that is, securities in connection with which fraud has allegedly been committed—can show injury of the type the rule is meant to prevent. The rule was promulgated for their benefit, see Greater Iowa Corporation v. McLendon, 8 Cir., 1967, 378 F.2d 783, and it is they who may invoke the 10b–5 right of action to obtain recompense for economic loss sustained. See, e. g., Vanderboom v. Sexton, 8 Cir., 1970, 422 F.2d 1233; City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221; Iroquois Industries, Inc. v. Syracuse China Corporation, 2 Cir., 1969, 417 F.2d 963; Greenstein v. Paul, 2 Cir., 1968, 400 F.2d 580. Those seeking to bring an action for damages sustained as a result of a violation of the rule must show a wrong done to them, that is, an invasion of their own federally protected interest to engage in securities transactions while free from the effects of deceptive or unfair practices employed in connection therewith, not merely a wrong done to someone else. See Association of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). We conclude, therefore, that for a plaintiff to establish his standing to maintain a Rule 10b–5 action for damages, he must be a purchaser or seller of the securities involved in connection with the alleged rule violation.

We do not say that only those who are purchasers or sellers in the "strict common law traditional sense," Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195, 203, may maintain an action for damages under Rule 10b–5. See, e. g., Mader v. Armel, 6 Cir., 1968, 402 F.2d 158; Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262. In deciding whether a plaintiff has standing, we search for what will best accomplish the congressional purpose. See Electronic Specialty Co. v. International Controls Corp., 2 Cir., 1969, 409 F.2d 937, 946. Thus we construe the "in connection with the purchase or sale of any security" clause found in both the section and the rule broadly and flexibly to effectuate that purpose. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967);

SEC v. Capital Gains Research Bur., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The "purchaser"-"seller" standing requirement is to be similarly construed, *see, e. g.,* Mader v. Armel, 6 Cir., 1968, 402 F.2d 158; Vine v. Beneficial Finance Company, 2 Cir., 1967, 374 F.2d 627, so that the broad design of the section and the rule is not frustrated by the use of novel or atypical transactions. Crane Company v. Westinghouse Air Brake Company, 2 Cir., 1969, 419 F.2d 787; A. T. Brod & Co. v. Perlow, 2 Cir., 1967, 375 F.2d 393.

Plaintiffs' position as shareholders suing derivatively on behalf of National American differs from their position as individuals suing in their own right, for they do allege that National American has purchased securities in connection with the fraud alleged, and the shareholder bringing a derivative action need not personally be a purchaser or seller. *E. g.,* Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221. Our inquiry consequently extends to whether count one alleges facts amounting to a "purchase" by National American within the meaning of section 10(b) and Rule 10b–5.

Plaintiffs contend that their corporation has standing to invoke the Rule 10b–5 right of action as a result of defendants' scheme to cause a merger into one company of National American, Alabama National, and another Arizona Group corporation on terms disadvantageous to National American. The alleged effect of the merger, when it takes place, will be to cause National American to acquire ownership of Wilder's control stock (both his First Colonial stock and his National American stock) at the premium price negotiated by the Arizona Group. Notwithstanding that the merger of the corporations has not yet been completed, plaintiffs argue that National American is a statutory "purchaser" entitled to damages under Rule 10b–5 for harmful acts already committed in furtherance of the plan to effect the merger. As authority for their proposition that damages may be awarded under Rule 10b–5 even though the securities transaction giving the plaintiff standing to sue has not been completed, plaintiffs rely upon Opper v. Hancock Securities Corporation, 2 Cir., 1966, 367 F.2d 157, aff'g S.D.N.Y., 1966, 250 F. Supp. 668, and Goodman v. H. Hentz & Co., N.D.Ill., 1967, 265 F.Supp. 440.[13]

In *Opper* a customer sued a brokerage house for damages allegedly resulting from the latter's failure to carry out his order to sell certain securities while the house was disposing of large amounts of similar securities it had held for its own account. The customer eventually sold his securities at a substantial loss. The Second Circuit, in affirming a judgment for the customer, stated, "Failure to carry out the order while disposing of its own similar stock was not only actionable under the contract but also a violation of the Securities Exchange Act." 367 F.2d at 158. That the Court did not particularize the violation committed makes *Opper* less persuasive than it otherwise might be in this case, since the customer in *Opper* proceeded on the theory that the brokerage house had violated section 15(c) (1) of the Exchange Act, as well as section 10(b). Moreover, even if *Opper* refers to section 10(b), it, like Stockwell v. Reynolds & Co., S.D. N.Y., 1965, 252 F.Supp. 215, 219, appears relevant in the present context only as support for the proposition that section 10(b) and Rule 10b–5 do not require that the plaintiff's purchase or sale immediately follow the defendant's fraud; it is not authority for the propositions that Rule 10b–5 does not require a statutory "purchase" or "sale" and that a private

---

13. Plaintiffs also rely upon Barnett v. United States, 8 Cir., 1963, 319 F.2d 340. That case, however, came to the Eighth Circuit on petition for review of an SEC order revoking the registration of a company as a broker-dealer and has little, if any, application in the context of private actions.

plaintiff need not be a statutory "purchaser" or "seller."

In *Goodman*, another customer-broker case, it was alleged that the broker had "sold" the customer nonexistent securities. The District Court upheld the customer's right to sue under Rule 10b–5 over the broker's argument that the Rule requires a completed purchase or sale of securities. 265 F.Supp. at 444. Since there could be no completed transaction, in a common-law sense, in a case involving the purported sale of nonexistent securities, the *Goodman* Court arguably was dispensing with the requirement of a securities transaction by the plaintiff in a Rule 10b–5 action. However, the Court further said that "[P]laintiffs were actual parties to transactions which, for the fraud of [defendant], would have been actual purchases or sales \* \* \*." *Id. Goodman,* therefore, rather than dispensing with the necessity of a "purchase" or "sale" of securities by the plaintiff in a Rule 10b–5 action, is consistent with the well-established proposition that a statutory "purchase" or "sale" is not necessarily a technical purchase or sale in common-law parlance. *See, e. g.,* Mader v. Armel, 6 Cir., 1968, 402 F.2d 158; Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262; Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195.

Unlike *Opper* and *Goodman,* customer-broker cases involving the sort of frauds associated with trading in the securities markets, count one catalogs a series of acts traditionally dealt with under state law as instances of corporate mismanagement or breaches of fiduciary duties in the corporate context. Plaintiffs seek to link these acts in a chain subject to federal law by their allegation of an overall scheme to defraud National American in connection with the planned merger of the latter. The broad purpose of this scheme, plaintiffs say, was to transfer control of National American from Wilder to the Arizona Group for a premium payable out of the assets of National American itself.

▇▇ We begin by recognizing that violators of section 10(b) and Rule 10b–5 are not immunized from civil liability for their unlawful acts merely because these acts were committed as part of a broader scheme of corporate mismanagement. Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; *see, e. g.,* O'Neill v. Maytag, 2 Cir., 1964, 339 F.2d 764, 768; New Park Mining Company v. Cranmer, S.D.N.Y., 1963, 225 F.Supp. 261, 266. Also, the legality of the entire scheme, under federal and state law, may in certain circumstances be determined by a federal court in an exercise of its pendent jurisdiction. *E. g.,* Errion v. Connell, 9 Cir., 1956, 236 F.2d 447.

▇ State-law mismanagement claims cannot be transformed into federal claims under Rule 10b–5, however, merely by means of general conclusionary allegations where one would otherwise not exist. *See* Lester v. Preco Industries, Inc., S.D.N.Y., 1965, 282 F.Supp. 459, 462; 6 Loss, Securities Regulation 3631 (Supp. 2d ed. 1969); *cf.* Jewell v. City of Covington, Ga., 5 Cir., 1970, 425 F.2d 459. Section 10(b) is not concerned so much with fraud per se as it is with the effect of fraud upon investors and upon the public interest in the maintenance of free and open securities markets nurtured in a climate of fair dealing. 48 Stat. 881; *see, e. g.,* Kahan v. Rosenstiel, 3 Cir., 1970, 424 F.2d 161, 173; SEC v. Texas Gulf Sulphur Co., 2 Cir., 1968, 401 F.2d 833, 858–860 (en banc); Hooper v. Mountain States Securities Corporation, 5 Cir., 1960, 282 F.2d 195, 202; Superintendent of Ins. of St. of N.Y. v. Bankers Life & C. Co., S.D.N.Y., 1969, 300 F.Supp. 1083, 1101. Unless the plaintiff has standing to sue for the rule violation he alleges and states a claim for relief under the rule, he must seek redress for the alleged fraud of the defend·ants under state law.

▇ To state a Rule 10b–5 claim in a case involving the sort of scheme allegedly employed in this case in violation of the rule, a plaintiff must frame his complaint so that it appears with reasonable clarity therefrom either that a purchase

or sale of securities by the plaintiff is the subject of the fraudulent scheme or that the inducement of such a purchase or sale is a purpose of the scheme. That the conduct complained of may be reprehensible does not require the conclusion that a federal remedy must be furnished. Iroquois Industries, Inc. v. Syracuse China Corporation, 2 Cir., 1969, 417 F.2d 963, 969. The rights and remedies provided by the Securities Exchange Act are to serve "in addition to any and all other rights and remedies that may exist at law or in equity * * *." Securities Exchange Act of 1934, § 28(a), 15 U.S.C. § 78bb. If Congress had intended that the federal courts inquire into every decision affecting the management of corporations and then fashion a new federal law superseding state law on the fiduciary responsibilities of corporate directors, officers, and controlling persons, presumably so revolutionary a federal intervention into an area traditionally handled by the states would have been clearly expressed. See Kaminsky v. Abrams, S.D.N.Y., 1968, 281 F.Supp. 501, 504–505. See also 1 Loss, Securities Regulation 121–129 (2d ed. 1961).

In the present case, plaintiffs allege a broad scheme to defraud National American, involving corporate waste, deprivation of corporate opportunity, and the like, which, plaintiffs say, results or will result in an acquisition of securities by the corporation through a merger. We must ask whether defendants' alleged conduct is the type of fraudulent behavior which was meant to be forbidden by section 10(b) and Rule 10b–5. Affidavits and attached papers made available to this Court by both sides to the litigation indicate that plaintiffs have grounds upon which to allege that defendants have caused the National American board of directors to resolve that the merger with Alabama National and the other Arizona Group corporation

be effected on the disadvantageous terms stated above.[14] The precise question presented, therefore, is whether, on these additional facts, National American is a "purchaser" or "seller" of securities for purposes of the section and the rule.

Under the circumstances of this case, we conclude that the resolution to merge is not unlike a partially consummated contract to buy or sell securities, and that, consequently, the broad antifraud purposes of 10(b) and 10b–5 would be clearly furthered by their application to this situation. See Securities Exchange Act of 1934, § 3(a) (13)–(14), 15 U.S.C. § 78c(a) (13)–(14); SEC v. National Securities, 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969). Shareholders approving a merger have been deemed "purchasers" of securities for purposes of the section and the rule, SEC v. National Securities, 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969), and a merged corporation has been deemed a "purchaser"-"seller." E. g., Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262, 267. In both situations, the persons allegedly injured were required to make decisions regarding the merits of transactions in securities. Here, facts have been adequately alleged upon which it can be contended that the National American board's determination to merge was not such as a reasonable man would make if possessed of all the material information known to the other party to the transaction—in this instance, the Arizona Group acting through its other corporations. As we have said in the Alabama National case decided today:

"* * * When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corpo-

---

14. The papers submitted purport to document, among other matters, the agreement, as amended, between Wilder and NSI, the National American board meeting approving the merger plan, other as-

pects of the merger, and the disposition of Wilder's First Colonial and National American stock since the agreement between Wilder and NSI was first made.

ration is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b–5 is available as a remedy for the corporate disability. We can make no meaningful distinction between this situation and [one in which] the other party to the securities transaction controls the judgment of all the corporation's board members or conspires with them or the one controlling them to profit mutually at the expense of the corporation, [for] the corporation is no less disabled from availing itself of an informed judgment than if the outsider had simply lied to the board. * * * "

Shell v. Hensley, 5 Cir., 1970, 430 F.2d 827 [Nos. 27447 and 27514]. In short, we think that where, as here, the defendants control all the corporations to be merged, it is unnecessary to require as a condition precedent to a Rule 10b–5 action for damages by one of the corporations that the merger already be consummated, provided, of course, that the corporation can show that it was directly and proximately injured by the defendants' fraud or deceit in connection with the resolution to merge.

■■■ We have said that only purchasers or sellers of securities involved in an alleged Rule 10b–5 violation—that is, securities in connection with which fraud has allegedly been committed—can show injury of the type the rule is meant to prevent. It is they who have suffered legal injury as a result of a rule violation which is compensable in a private action. Section 28(a) of the Exchange Act provides that "[N]o person permitted to maintain a suit for damages under the provisions of this [Act] shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb(a). *Compare* Securities Exchange Act of 1934, § 28(a), 15 U.S.C. § 78bb(a), *with* Clayton Act § 4, 15 U.S.C. § 15. *See also* Green v. Wolf Corporation, 2 Cir., 1968, 406 F.2d 291, 302–303. The gist of the Rule 10b–5 action for damages is economic injury to the plaintiff resulting proximately from the acts of the defendants which constitute a violation of the rule. *Cf.* Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 9 Cir., 1965, 346 F.2d 1012; Association of Western Railways v. Riss & Company, 1962, 112 U.S.App.D.C. 49, 299 F.2d 133. In this case, plaintiffs allege that defendants have damaged National American in many ways by acts committed to further their overall conspiracy involving the sale of control of National American. Their action is not based merely upon the existence of the conspiracy, SEC Rule 10b–5(1), 17 C.F.R. § 240.10b–5(1), but rests also upon the damage they allege has resulted to National American from those acts of defendants which are found to constitute the employment of manipulative or deceptive devices or contrivances "in connection with" a purchase or sale by the corporation. Such damage is the legal injury to National American which is compensable under the rule. As we have indicated, plaintiffs do have grounds for alleging a statutory "purchase" or "sale" by their corporation. On remand, therefore, it must be determined whether National American, as a "purchaser" or "seller," has been proximately injured by acts amounting to the employment by defendants of a scheme to defraud the corporation in violation of the rule. The question whether the acts complained of in count one constitute a consistent course of conduct carried on to defraud National American in connection with the latter's transaction in securities, and whether this transaction is the subject of all or a part of the overall scheme, goes to the merits of plaintiffs' case, not to the issue whether plaintiffs have stated a claim upon which relief can be granted under section 10(b) and Rule 10b–5. Further proceedings are clearly necessary here.

### B. *Count Two*

The fraud alleged in count two involves National American's purported purchase

of worthless First Colonial stock from Harris for $100,000 by the pretext of a loan secured by a pledge of the stock actually purchased. Count two does not allege that the "loan" has been defaulted or that foreclosure on the stock has become necessary. Because such facts are not alleged, defendants argue that count two fails to allege a purchase of securities by National American. The question presented, consequently, is whether count two adequately states facts amounting to a "purchase" within the meaning of section 10(b) and Rule 10b–5 so as to entitle plaintiffs to maintain a derivative action under the section and rule for damages and injunctive relief on behalf of their corporation.[15]

▆ Given the reading Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957), requires, count two sufficiently avers, for purposes of withstanding a motion to dismiss made under Fed. R.Civ.P. 12(b), that the pledge agreement was pretextual, disguising a purchase in substance by National American of Harris' worthless stock.[16] Consequently, we conclude that dismissal of count two cannot be sustained on the ground that neither plaintiffs nor their corporation has standing to bring a Rule 10b–5 action on the facts alleged in this count. See, e. g., City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221.

Defendants argue that plaintiffs have not stated a claim under Rule 10b–5 because the complaint does not allege facts amounting to a deception of National American which is causally related to a purchase or sale of securities by the corporation. From the complaint, it appears that Harris, a director and "con-trolling person" of National American, entered into an agreement with the corporation in which the latter agreed to purchase worthless stock from the director. For the reasons we have expressed in Shell v. Hensley, 5 Cir., 1970, 430 F.2d 819 [Nos. 27447 and 27514], we conclude that dismissal of count two cannot be sustained on the ground that it fails to allege facts amounting to causal deceit. Accordingly, we must send this case back for the normal process of factual development and the determination of the real merits of the dispute. Merlite Land, Sea & Sky, Inc. v. Palm Beach Investment Properties, Inc., 5 Cir., 1970 426 F.2d 495.

## C. Count Three

Plaintiffs contend that count three sufficiently alleges a fraud on National American in connection with a purchase by it of securities. The allegations from which plaintiffs claim a securities purchase by National American should be gleaned are as follows: Latta borrowed money from an unnamed person in order to purchase Dawl stock and caused National American to guarantee this loan; Latta then pledged the Dawl stock he had purchased as security for the loan; subsequently, Latta exchanged his Dawl stock for First Colonial stock and caused National American to agree to a substitution of the First Colonial stock for the Dawl stock as security for the loan, even though the First Colonial stock was not worth the amount owed on the loan. Plaintiffs' position, apparently, is that National American, by virtue of its role as the guarantor of the loan to Latta, became a "purchaser" of securities when Latta pledged the stock he bought as col-

---

15. Plaintiffs have not argued that they have an action on behalf of themselves and their class of National American shareholders on the facts alleged in count two.

16. The count reads in pertinent part:
 "1. On, to-wit, February 24, 1967, National American Life Insurance Company agreed to purchase for One Hundred Thousand Dollars ($100,000) from Luther D. Harris, then one of its direc-

tors, Twelve Thousand Nine Hundred Forty-Seven (12,947) shares of the common stock of First Colonial Corporation of America, which were then and are now worth less.

"2. In order to conceal the true nature of said transaction, papers were drawn to indicate that the transaction was a loan * * *."

Elsewhere in the count it is alleged that the First Colonial stock was "worthless."

lateral for the loan. Plaintiffs base their argument upon the Second Circuit's decision in SEC v. Guild Films Co., 2 Cir., 1960, 279 F.2d 485.

The *Guild Films* case arose under the Securities Act of 1933. There an individual caused a corporation he controlled to purchase from Guild Films unregistered stock in that company. He purported to take the stock for investment only, and a restriction to this effect was stamped on the certificates. Subsequently, this individual caused the stock to be pledged to certain banks as additional collateral for his already overdue personal notes. Upon his default, the banks attempted to sell the unregistered stock. The SEC then sought to enjoin the sale by the banks. Concluding that the banks were "underwriters" within the meaning of section 2(11) of the Securities Act, the Second Circuit stated:

> "The banks cannot be exempted on the ground that they did not 'purchase' within the meaning of § 2(11). The term, although not defined in the [Securities] Act, should be interpreted in a manner complementary to 'sale' which is defined in § 2(3) as including 'every * * * disposition of * * * a security or interest in a security, for value * * *.' In fact, a proposed provision of the Act which expressly exempted sales 'by or for the account of a pledge holder or mortgage selling or offering for sale or delivery in the ordinary course of business and not for the purpose of avoiding the provisions of the Act, to liquidate a bona fide debt, a security pledged in good faith as collateral for such debt,' was not accepted by Congress."

279 F.2d at 489 (citations omitted).

■ *Guild Films* is factually distinguishable in material respects from the situation alleged in count three. Here, there is no allegation that the loan has been defaulted or that foreclosure on the pledged stock has become necessary. It is not alleged that National American has paid anything for the purported interest in Latta's securities it holds. Moreover, it is not alleged that National American was the pledgee; rather, the corporation was the guarantor of the pledgor. Apart from these distinctions, whatever the term "sale" means in section 2(11) of the Securities Act, we are here concerned only with whether the purposes of section 10(b) of the Exchange Act and Rule 10b–5 thereunder would be advanced by their application to the sort of loan-guarantee-pledge series of transactions presented in this case. Liberally viewed, count three shows that the effect of the fraud alleged is an extension of National American's credit on Latta's behalf. So far as the complaint reveals, this extension was made coincidentally with a stock purchase by Latta. It is not alleged that the corporate decision to make the extension was made in connection with Latta's personal transaction. On these facts, we conclude that defendants' behavior in causing this extension, even if proved to be as alleged, is not the type of fraudulent conduct which was meant to be forbidden by the section and the rule. *See* SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969). Therefore, National American is not a "purchaser" of securities which is entitled to bring an action under section 10(b) and Rule 10b–5 on the facts alleged in count three.

We leave to the District Court on remand the determinations whether the claims presented in count three are within the court's pendent jurisdiction, United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); see Kletschka v. Driver, 2 Cir., 1969, 411 F.2d 436, 450, and whether, if new facts are brought to light in further proceedings, these facts entitle plaintiffs or their corporation to invoke the private right of action under section 10(b) and Rule 10b–5 for the conduct complained of in this count.

### D. Count Four

In count four plaintiffs seek to enjoin defendants from consummating the merger of National American with Ala-

bama National and one or more other Arizona Group companies. This merger allegedly will be disadvantageous to National American and its shareholders in that the merger calls for National American, in effect, to pay Wilder the sale-of-control premium negotiated by the Arizona Group and for the present National American shareholders to receive stock in the post-merger corporation which is worth less than their National American stock is worth now. Count four also alleges in conclusionary terms that solicitations misleading in some way not pleaded have been mailed to National American shareholders to obtain proxies supporting the election of Arizona Group nominees to the National American board of directors.

 Injunctive relief may be awarded to a private plaintiff under Rule 10b–5 in a proper case. *E. g.*, Kahan v. Rosenstiel, 3 Cir., 1970, 424 F.2d 161; Britt v. Cyril Bath Company, 6 Cir., 1969, 417 F.2d 433; Mutual Shares Corporation v. Genesco, Inc., 2 Cir., 1967, 384 F.2d 540. Such relief is available to undo a merger effected in violation of Rule 10b–5. SEC v. National Securities, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed. 2d 668 (1969); Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262. No reason is apparent why, under appropriate circumstances, an injunction cannot also be obtained to prevent the completion of a merger that is in the process of being effected in violation of the rule. Under the circumstances of this case, including the information presented to this Court by the parties, we conclude that plaintiffs have stated a 10b–5 claim for relief on behalf of National American in count four. Our conclusion is reached for the reasons we have expressed in regard to the allegations of count one. Whether an injunction would be premature in this case, as defendants suggest, can be determined only after the facts have been developed. Compare Kohn v. American Metal Climax, Inc., E.D.Pa., 1970, 313 F.Supp. 1251. Further proceedings are, therefore, necessary. Since the relief plaintiffs seek in count four is obtainable in a derivative action, we do not reach the question whether plaintiffs also have standing in their own right under section 10(b) and Rule 10b–5 to seek this relief.

## IV.

This Court has not previously had occasion to consider whether a private right of action exists for violations of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. The Second, Third, and Tenth Circuits have recognized such a right. Brown v. Bullock, 2 Cir., 1961, 294 F.2d 415 (en banc); Taussig v. Wellington Fund, Inc., 3 Cir., 1963, 313 F.2d 472; Esplin v. Hirschi, 10 Cir., 1968, 402 F.2d 94. Only the Eighth Circuit has reached the opposite conclusion, Brouk v. Managed Funds, Incorporated, 8 Cir., 1961, 286 F.2d 901, vacated as moot, 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962), and that Court has indicated that a different result might obtain in a proper case. Greater Iowa Corporation v. McLendon, 8 Cir., 1967, 378 F.2d 783, 793.

The history of the investment company industry prior to the passage of the Investment Company Act has been well summarized as follows:

"Born in boom times, weaned upon the 1929 crash, and plagued with a fringe of thoroughly dishonest manipulators, the * * * industry grew without any effective regulation * * * to reap the whirlwind. * * * [T]he picture presented by the Securities and Exchange Commission after a four-year investigation showed fantastic abuse of trust by management and wholesale victimizing of investment company security holders. In general the abuses stemmed from the control of investment companies by banking, brokerage, or dealer interests—a control founded in complicated capital structures, disguised behind meagre, and often misleading, reports to stockholders, and exercised to benefit the sponsor without regard to any

stewardship on behalf of the investors who put up the money."
Comment, The Investment Company Act of 1940, 50 Yale L.J. 440, 441–442 (1941).[17] Determining that the disclosure treatment of the 1933 and 1934 Acts was insufficient to prevent these abuses Congress meant by the Investment Company Act to establish a comprehensive scheme for regulating issuers of securities which engage in the business of investing and trading in the securities of others. *See* 1 Loss, Securities Regulation, 144–147 (2d ed. 1961). The technique of the Act is to require registration with the SEC of all investment companies that use the mails or interstate facilities, with registration serving as the handle for the regulatory scheme. Section 7 of the Act imposes the penalty of exclusion from all channels of interstate commerce of investment companies that fail to register in compliance with section 8, 15 U.S.C. §§ 80a–7, 80a–8, and contracts made by unregistered companies are subject to the voiding provisions of section 47(b), 15 U.S.C. § 80a–46(b). The other sections of the Act concern the regulation of registered companies.

In the present case, plaintiffs allege that First Colonial is, and holds itself out to the public as being, an "investment company" within the meaning of section 3 of the Investment Company Act, 15 U.S.C. § 80a–3. They further allege that First Colonial has never complied with the registration provisions of section 8. Count one of the amended complaint avers that National American

and its shareholders have been damaged as a result of various transactions that defendants have caused National American to enter into with First Colonial. Specifically, it is alleged that First Colonial was caused by defendants to dominate and control the affairs of National American in violation of section 7(a) (5) of the Act and to transact business with National American in interstate commerce in violation of section 7(a) (4), all to the damage of National American and its shareholders. Plaintiffs, on behalf of themselves and similarly situated National American shareholders and derivatively on behalf of National American, seek to bring an action under the Investment Company Act to enforce the duties and liabilities that act imposes upon defendants.

Defendants argue that the amended complaint fails to state a claim upon which relief can be granted under the Investment Company Act and that, in any event, plaintiffs lack standing to bring an action for the violations about which they complain. More particularly, defendants contend that the Act creates a private right of action only in favor of those who invest in the securities issued by investment companies and that a suit based upon nonregistration can be brought only if the plaintiff's damage is a direct result of the failure to register.

█ In deciding the question of standing, we assume that First Colonial is an "investment company" and is not exempted from the registration requirements of the Investment Company Act.

17. One commentator enumerated some of the abuses as follows:
"* * * [I]n some instances investment companies were looted by strong-arm tactics involving actual fraud or larceny, and in other cases much the same result was obtained by a widespread employment of most of the known corporate abuses—the formation of companies on 'shoestring' capital; the use of broad charter provisions relative to powers of management and the corporate purpose; the inclusion of exculpatory clauses to shield mismanagement; the failure of sponsors and officers to make capital contributions to some extent, at least, commensurate with their position in the company; perpetuation of control by such persons through proxy solicitations, staggered elections, and seriatim resignations of directors; excessive promotional and managerial expenses; inadequate disclosure of company activities; the failure of dummy directors and others to fulfill their fiduciary duties; and the complexities caused by pyramiding and cross or circular ownership."
Note, The Investment Company Act of 1940, 41 Colum.L.Rev. 269, 273–274 (1941).

We also assume, for the purpose of deciding this question, that the Investment Company Act affords a private right of action for injury suffered from its violation to the class of persons whose interest the Act was designed to protect. Cf. Eastside Church of Christ v. National Plan, Inc., 5 Cir., 1968, 391 F.2d 357, 362; Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422. We affirm the principle that private actions provide a necessary supplement to SEC action in the enforcement of the Investment Company Act. J. I. Case Company v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). This does not mean, however, that anyone may assume the role of private policeman. Only persons showing injury of the type the Investment Company Act was meant to prevent may be afforded a civil remedy by the Act. SEC v. General Time Corp., 2 Cir., 1968, 407 F.2d 65, 71; Greater Iowa Corporation v. McLendon, 8 Cir., 1967, 378 F.2d 783, 793–794. We turn, then, to consider the congressional purpose behind the Investment Company Act of 1940.

Section 1(a) of the Act presents the findings supporting the congressional conclusion that investment companies are affected with a national public interest. 15 U.S.C. § 80a–1(a). Section 1(b) declares that the national public interest and the interest of investors are adversely affected by various practices.[18] The enumerated practices found to have an adverse effect upon the national public interest and the interest of investors fall into the following categories: (1) failure to provide adequate, accurate information to prospective investors and shareholders in investment companies; (2) management of portfolios in the interests of managements and their affiliates rather than in the interests of the shareholders; (3) use of unsound, misleading, and unsupervised accounting practices; and (4) changes in the character of the company's business without the consent of the shareholders. Motley, Jackson & Barnard, Federal Regulation of Investment Companies Since 1940, 63 Harv.L.Rev. 1134, 1140 n. 27 (1950). The purpose of the Act is to eliminate these abuses, 15

---

18. Such adverse effects are caused
"(1) when investors purchase, pay for, exchange, receive dividends upon, vote, refrain from voting, sell, or surrender securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their management;

"(2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters, brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders;

"(3) when investment companies issue securities containing inequitable or discriminatory provisions, or fail to protect the preferences and privileges of the holders of their outstanding securities;

"(4) when the control of investment companies is unduly concentrated through pyramiding or inequitable methods of control, or is inequitably distributed, or when investment companies are managed by irresponsible persons;

"(5) when investment companies, in keeping their accounts, in maintaining reserves, and in computing their earnings and the asset value of their outstanding securities, employ unsound or misleading methods, or are not subjected to adequate independent scrutiny;

"(6) when investment companies are reorganized, become inactive, or change the character of their business, or when the control or management thereof is transferred, without the consent of their security holders;

"(7) when investment companies by excessive borrowing and the issuance of excessive amounts of senior securities increase unduly the speculative character of their junior securities; or

"(8) when investment companies operate without adequate assets or reserves."
15 U.S.C. § 80a-1(b).

U.S.C. § 80a–1(b), through the accomplishment of five basic objectives. These objectives are (1) adequate safeguards for investors in the distribution and sale of investment company securities, (2) honest, unbiased management of investment companies, (3) greater participation in management by holders of investment company securities, (4) creation and maintenance of adequate feasible capital structures of such companies, and (5) transmittal of adequate financial statements and promulgation of uniform accounting rules. *See* 10 SEC Ann.Rep. 162–163 (1944), in 1 Loss, Securities Regulation 149–152 (2d ed. 1961). The scheme of regulation designed to accomplish the statutory purpose, as indicated above, is pegged upon registration with the SEC of all investment companies doing business in interstate commerce which are not entitled to some exemption.

The Investment Company Act was the fifth in a series of federal statutes designed to eliminate certain abuses in the securities industry, abuses that were found to have contributed to the 1929 financial crash and the depression of the 1930's. It was preceded by the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq.*, and the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa *et seq.* Like the earlier statutes, the Investment Company Act was meant to provide another step toward a return to the understanding that those who manage other people's money are trustees acting for others. *Cf.* SEC v. Capital Gains Research Bur., 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963); S.Rept. No. 47, 73d Cong., 1st Sess. 7 (1933) (presidential message to Congress). From a reading of the "Findings and Declarations of Policy" in section 1, as well as of the substantive provisions of the Act, we think it is clear in light of the circumstances under which the Act was passed that Congress intended to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons who put up money to be invested by such companies on their behalf.

Plaintiffs in the present case do not allege in count one that they or National American hold any ownership interest in First Colonial, the alleged investment company. Plaintiffs' theory is that where an unregistered investment company such as First Colonial dominates another company, in violation of section 7(a) (5) of the Investment Company Act, 15 U.S.C. § 80a–7(a) (5), to the detriment of the dominated company and to the benefit of the unregistered company, a private right of action under the Investment Company Act should be afforded to shareholders of the dominated company. We consider this theory unsound. In relation to First Colonial, plaintiffs and their class stand as fellow shareholders of National American. In essence, plaintiffs are complaining about the mismanagement of National American which allegedly has been effected by a controlling shareholder (First Colonial). The history and whole pattern of the Investment Company Act convince us that Congress by this statute intended to deter mismanagement of investment companies for the protection of investment company security holders, *see, e. g.*, Greater Iowa Corporation v. McLendon, 8 Cir., 1967, 378 F.2d 783; Verrey v. Ellsworth, S.D. N.Y., 1969, 303 F.Supp. 497, not to regulate the management of companies in which investment companies put their funds. The latter purpose may be served by resort to the other federal securities laws, the antitrust laws, and the like. If any legally protected rights of plaintiffs or their corporation have been invaded as a result of an exercise by defendants of First Colonial's controlling interest in National American, plaintiffs must look elsewhere than to the Investment Company Act for a remedy. To be sure, section 7(a) (5) proscribes First Colonial's domination of

National American, but plaintiffs have not alleged that, as a result of this violation, they or National American have suffered harm to any interest of theirs which is within the zone of interests protected by the Investment Company Act.[19] Therefore, we hold that plaintiffs lack standing to bring an action under the Investment Company Act on the facts alleged in count one.

### V.

We turn finally to defendants' contention that grounds independent of whether the District Court had subject-matter jurisdiction of plaintiffs' claims or whether plaintiffs stated any claims upon which relief can be granted exist for sustaining the judgment below. These grounds are (1) want of indispensable parties and (2) failure of plaintiffs to comply with all requirements for the maintenance of a shareholder's derivative action in federal court. Specifically, defendants argue that the decision below was correct because, under Fed.R.Civ.P. 19, the case could not proceed properly without Wilder and First Colonial as parties and because, under Fed.R.Civ.P. 23.1, plaintiffs did not make a demand for corrective action on the directors and shareholders of National American before bringing this derivative action on National American's behalf. We disagree with defendants' contentions.

■ The argument that Wilder and First Colonial should be described with the conclusory term "indispensable parties" is without merit. *See generally*

Morrison v. New Orleans Public Service, Inc., 5 Cir., 1969, 415 F.2d 419. The relief plaintiffs seek can be accorded from the defendants named in the complaint, these defendants are not left subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interests of Wilder and First Colonial, and Wilder and First Colonial do not appear to be so situated that disposition of this action might as a practical matter impair or impede their ability to protect the interests defendants claim they have. Fed. R.Civ.P. 19(a). Rule 19, as amended in 1966, was not meant to unsettle the well-established authority to the effect that joint tortfeasors or coconspirators are not persons whose absence from a case will result in dismissal for nonjoinder. Advisory Committee's Note to Rule 19, in 39 F.R.D. 89, 91 (1966). See also State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); 2 Barron & Holtzoff, Federal Practice and Procedure § 513.8 (Wright rev. ed. 1961, Supp. 1968).

■ The argument that plaintiffs have failed to comply with the demand requirements, such as they are, of Rule 23.1 similarly does not justify dismissal of the amended complaint. Rule 23.1 provides that in a shareholder's derivative action, the complaint shall allege "with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors * * and, if necessary, from the shareholders * * * and the reasons for his failure to obtain the action or for not making

19. Plaintiffs also seek to bring an action under section 47(b) of the Investment Company Act, 15 U.S.C. § 80a-46(b). The language of section 47(b) establishes that violators and knowing successors in interest are precluded from enforcing contracts made in violation of the Act or any rule thereunder or whose performance would involve such a violation. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970) (construing section 29(b) of the Exchange Act, an analogue to section 47(b) of the Investment Company Act). In this case, however, plaintiffs have not alleged that there was any contractual relation between National American and defendants herein which was made in violation of any section of the Investment Company Act. Consequently, we do not reach the question whether section 47(b), like section 29(b) of the Exchange Act, Eastside Church of Christ v. National Plan, Inc., 5 Cir., 1968, 391 F.2d 357, 362, contemplates private actions for relief by innocent parties to contracts made in violation of the Investment Company Act or performed in violation of the Act.

the effort." Plaintiffs admit that a demand for corrective action was not made upon the National American board of directors or shareholders before this action was commenced, but argue that such demands would have been futile and unavailing. Under the circumstances alleged in the *Conley*-read complaint, we agree with plaintiffs. Accordingly, we conclude that plaintiffs cannot be foreclosed from maintaining this action on the ground that they have not complied with Rule 23.1.

The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.